# UNITED STATE DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANTHONY L. DANIELS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-cv-637-TWP-DML |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Anthony L. Daniels ("Daniels"), requests judicial review of the final decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), denying Daniels' application for a period of disability and disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act. 42 U.S.C. § 405(g). For the reasons set forth in this opinion, the Court **AFFIRMS** the decision of the Commissioner.

## I.  BACKGROUND

### A.  PROCEDURAL HISTORY

On April 23, 2007, Daniels filed an application for a period of disability and DIB, alleging disability beginning March 28, 2007. Daniels' application was denied initially on September 20, 2007 and again upon reconsideration on November 30, 2007. Thereafter, Daniels requested a hearing, which was held on October 22, 2009. On December 14, 2009, the Administrative Law Judge ("ALJ") denied the application for DIB. Daniels then requested a review of the decision. On April 9, 2010, the Appeals Council denied review of the ALJ's decision. Upon the Appeals Council's denial of review, the ALJ's decision became the final

decision of the Commissioner. 20 C.F.R. § 404.981; *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). Daniels now requests review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**B.      DANIELS' WORK HISTORY**

Daniels was born June 18, 1968 and was forty-one years old at the time the ALJ denied his original claims. (Tr. 22; 24.) He is a high school graduate and attended special education classes. (Tr. 135.) Before his application for DIB, Daniels was employed as a car detailer, a laborer, and a porter/custodian. (Tr. 131.) Additionally, Daniels worked part-time as a custodian during the summer prior to his hearing before the ALJ. When asked about that employment, Daniels stated that he liked it but felt "overwhelmed sometimes" and ultimately quit because he was given "too many responsibilities". (Tr. 299-300.)

**C.      MEDICAL HISTORY**

**1.      Borderline Intellectual Functioning & Dyslexia**

On July 11, 1996, Daniels underwent an intelligence and performance evaluation conducted by a psychologist, Pat Daggy, Ed.D. ("Daggy"). Daggy opined that Daniels functioned "within the Mildly Mentally Handicapped range," was "functionally illiterate" and "can only compute very basic mathematical problems." (Tr. 265.) Daniels was assessed with a verbal IQ of 71, a performance IQ of 77, and a full scale IQ of 73. (Tr. 266.) Daggy stated that he considered the test scores to be a "valid representation" of Daniels' abilities. (Tr. 264.) Daniels' rate of task completion was moderate, and he followed directions well. (Tr. 264.) Daggy also noted that Daniels "can be a reliable worker; he has proven that." (Tr. 265.)

On July 13, 2007, Daniels underwent a mental status examination by a clinical psychologist, Robert Blake, Ph.D. HSPP ("Dr. Blake"). (Tr. 227.) Dr. Blake noted that the examination suggested "significant problems with concentration, memory, mental calculation,

abstracting ability, general knowledge, and judgment." (Tr. 229.) Dr. Blake stated that the exam indicated that Daniels' cognitive limitation may severely impact his ability to work and formal "intelligence testing would help complete the picture." (Tr. 229.)

As a result of Dr. Blake's evaluation, a second examination was conducted by a clinical psychologist, Jerome Modlik, Psy.D. ("Dr. Modlik"), on August 15, 2007. (Tr. 238.) At this examination, Daniels was found to have a verbal IQ of 60, a performance IQ of 58, and a full scale IQ of 55. (Tr. 240.) However, Dr. Modlik noted that Daniels was "superficially cooperative ... [and] the results immediately suggest malingering." (Tr. 240.) Dr. Modlik stated that Daniels' behavior and scores constituted "unimpeachable evidence of [his] malingering of cognitive impairments". (Tr. 241.) Dr. Modlik opined that Daniels was "capable of doing simple repetitive work" and "competent to handle his own funds". (Tr. 241.)

On December 20, 2007, Daniels underwent another psychological assessment, which was conducted by Paul Martin, Ph.D. ("Dr. Martin"). Daniels received a verbal IQ of 71, performance IQ of 75, and full scale IQ of 72. (Tr. 272.) Dr. Martin noted that Daniels "concentrate[d] and persiste[d] well" during the evaluation. (Tr. 271.) Daniels' scores indicated "Borderline Intelligence, and Learning Disorder (he is functionally illiterate and innumerate)." (Tr. 274.) However, Dr. Martin stated that "the results predict good success for [Daniels] at the unskilled level...". (Tr. 272.)

## 2. Depression

Notes from clinical visits in April of 2007 reported signs of "depressed mood, anhedonia, hopelessness, fatigue, insomnia, [and] irritability" and that Daniels' depression started with a change in job duties. (Tr. 212.) Daniels was a low risk for suicide but indicated that job stress

affected his mood. (Tr. 212.) At that time, he was prescribed Zoloft and Flexotine for his depression. (Tr. 211-212.)

At a psychological evaluation with Dr. Blake in July of 2007, Daniels was diagnosed with "[m]oderate to sever major depression" and assessed a Global Assessment of Functioning ("GAF") of 40. (Tr. 229). However, Dr. Roth, Ph.D., a treating source from Buchanan Counseling Center, found that Daniels had a GAF of 55 in both April 2007 and July 2009. (Tr. 234, 337.) In July 2009, Dr. Roth diagnosed Daniels with Adjustment Disorder with Mixed Anxiety and Depressed Mood. (Tr. 337.)

During a December 2007 examination, Dr. Martin noted that Daniels was "alert, zesty in response and correctly oriented" but that he displayed "tension and anxiety through much of the interview and testing." (Tr. 271.) Daniels' self-reports indicated "mild or moderate distress." (Tr. 273.) Dr. Martin found that Daniels' examination "results [were] consistent with Major Depression." (Tr. 273.) Daniels reported that work was "therapeutic for him," but he was unemployed at the time. (Tr. 272.) Dr. Martin suggested treatment but noted that Daniels would "enjoy a significant symptom remission once he returns to gainful, full-time employment." (Tr. 273.)

Evidence was also submitted by Daniels' treating source, primary care physician Dr. Erin Krebs, M.D. ("Dr. Krebs"). In April 2007, Dr. Krebs initially opined that Daniels was incapacitated due to a recent onset of major depressive disorder and Dr. Krebs expected gradual improvement over the course of several months. (Tr. 311.) On January 7, 2008, Dr. Krebs stated that Daniels had been "off work due to dyslexia and depression" and he was "currently able to work up to 4 hours/day without restrictions on physical activity." (Tr. 317.) Again, on

July 10, 2008, Dr. Krebs noted that Daniels was able to work up to four hours a day without physical restrictions.  (Tr. 326.)

## D.    THE HEARING

A hearing was held on October 22, 2009, at which Daniels, his wife Jacqueline Daniels ("Mrs. Daniels"), and a vocational expert testified.

### 1.    Daniels' Testimony

Daniels testified that he had a high school diploma and participated in special education classes while in school.  However, his dyslexia prevented him from reading.  (Tr. 37.)  He had tutors but had difficulty remembering what they taught him.  (Tr. 38.)  Daniels had a driver's license but passed the written exam by having it read to him.  (Tr. 40-41.)

Daniels testified that his previous employment of "car detailing" consisted of washing cars.  (Tr. 34.)  He was able to perform that job until he was required to read and deliver cars, at which point he had to quit because he could not read maps or instructions.  Daniels testified that he loved to work and had "worked ... all my life."  (Tr. 36.)  He confirmed that he had gone to vocational rehabilitation where he was assigned a job coach who helped him look for jobs and fill out applications.  (Tr. 36.)  In the summer prior to the hearing, Daniels had a job at Kroger where he worked four hours a day cleaning bathrooms.  (Tr. 41.)  He testified that he was laid off from that job because he was unable to read the labels on chemicals.  (Tr. 42.)

Daniels testified that he was depressed, had no friends, had suicidal thoughts, and that he experienced stress when asked to read on the job.  (Tr. 38-39.)  He said he had been treated for depression but stopped because his wife's insurance only covered his treatment for two years, and he could no longer pay.  (Tr. 41.)

### 2.    Mrs. Daniels' Testimony

Mrs. Daniels testified that she and Daniels had been married for three years.  (Tr. 43.)  She testified that Daniels had tried over and over to get jobs, and those jobs would last for "maybe a couple years."  (Tr. 43.)  However, these jobs would end when the job would require Daniels to read or write.  (Tr. 43.)  Mrs. Daniels testified that she filled out all of Daniels' job applications.  (Tr. 43.)  Daniels could only perform simple math, and Mrs. Daniels handled their money.  (Tr. 44.)  She confirmed that Daniels got his driver's license by having the test given to him orally and that she read the book to him prior to his taking the test.  (Tr. 44-45.)

Mrs. Daniels said that Daniels could not cook or do laundry because he could not read labels or recipes.  (Tr. 46.)  She testified that Daniels would sometimes get lost and have to call her for directions. (Tr. 46-47.)   Daniels would sometimes forget to do "little minor things" around the house such as feeding the dog or getting food from the refrigerator for her to prepare for meals.  (Tr. 48.)

When asked whether Daniels exhibited any signs of depression, she answered in the affirmative and explained that he would get irritable at times.  (Tr. 45.)  She testified that he was "close with his cousins and they call every now and then," but he had no other friends.  (Tr. 45-46.)

### 3.    Vocational Expert's Testimony

Lastly, a vocational expert, Mark Anderson (the "VE"), testified at the hearing.  (Tr. 50.)  He testified that Daniels' past work was unskilled and categorized it as "medium level exertion."  (Tr. 50.)  The ALJ provided the VE with a hypothetical in which an individual was of the same age, education, and work experience as Daniels. That individual has "no physical limitations to work, but due to intellectual issues and mental issues is limited to simple, repetitive tasks which

require little or no independent judgment or analysis to perform."  (Tr. 51.) Furthermore, the work environment must be "no more than mild to moderately stressful." (Tr. 51.)  The individual would need a 10-15 minute break for every two hours of work to "refresh his or her ability to perform work-related tasks."  (Tr. 51.)  Finally, "[n]o reading or writing should be required by this job, but there are no restrictions on learning by visual demonstration."  (Tr. 51.)

In response to the ALJ's hypothetical, the vocational expert testified that the hypothetical individual could perform Daniels' past work as well as several other jobs in the state's economy. The individual could work as a dishwasher, laundry laborer, and an assembler of small products. (Tr. 51-52.)  Respectively, there were 10,000, 3,500, and 10,000 of these jobs available in Indiana. (Tr. 51-52.)

The vocational expert also testified that if the individual were assumed to have limitations on his memory, such as those testified to by Daniels and his wife, that individual would have difficulty performing work in a competitive economy because that individual would have the propensity to get "off-task."  (Tr. 52.)

## II.  DISABILITY AND STANDARD OF REVIEW

To be eligible for DIB, a claimant must establish a disability under 42 U.S.C. § 423. "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

In order to determine whether a claimant is disabled, the ALJ must evaluate the claim based on the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a)(4).  At step one, the ALJ must consider whether the claimant is engaged in a substantial gainful activity. If the claimant has engaged in such activity, then he is not disabled.  *Id*.  Second, the ALJ

considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement set forth in 20 C.F.R. § 404.1509 or a combination of impairments that meets the duration requirement, the claimant is not disabled. *Id*. In the third step of the analysis, the ALJ considers the medical severity of claimant's impairments. If claimant has an impairment that meets or is equal to one of the impairments listed in the Appendix 1 of this section and meets the duration requirement, the claimant is disabled. *Id*. At step four, the ALJ considers the assessment of claimant's residual functional capacity ("RFC") and his past relevant work, and if the claimant is still able to do his past relevant work, the claimant is not disabled. *Id*. The last step of the evaluation process requires the ALJ to consider the claimant's RFC assessment, age, education, and work experience to determine if claimant can make an adjustment to other work. If an adjustment can be made, claimant is not disabled. *Id*. The burden of proof during steps one through four is on the claimant; however, the burden shifts to the Commissioner at step five. *Knight v. Chater,* 55 F.3d 309, 313 (7th Cir. 1995).

The district court is vested with jurisdiction to review Commissioner's denial of benefits. 42 U.S.C. § 1383(c)(3). However, the court's standard of review in disability cases is limited. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citation and quotations omitted). The court must determine whether the final decision of the Commissioner is supported by substantial evidence and is based on the proper legal criteria. *Id*. (citation omitted). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation and quotations omitted). If the Commissioner's findings are supported by substantial evidence, the ALJ's decision will be upheld. *Id*.

While reviewing the record, the court will conduct a critical review of both the evidence that supports and detracts from Commissioner's final decision. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (citations omitted). "[T]he decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (quotation marks omitted). In addition, the court will review whether the ALJ rationally articulated the grounds for his decision, and a remand may be required if the ALJ failed to "build an accurate and logical bridge from the evidence to the conclusion." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). However, the court must not attempt to substitute its judgment for the ALJ's "by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (quoting *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999)).

## III. <u>DISCUSSION</u>

### A. THE ALJ'S FINDINGS

In his decision, the ALJ found that Daniels met the disability insured status requirements of the Social Security Act through March 31, 2011. (Tr. 14.) At step one, the ALJ found that Daniels had not engaged in substantial gainful activity since the alleged onset date of March 28, 2007. (Tr. 14.) At step two, the ALJ determined that Daniels "has the following severe impairments: depression; dyslexia; and borderline intellectual functioning." (Tr. 15.) At step three, however, the ALJ found that Daniels' impairments, either singly or in combination, did not meet or medically equal an impairment listed at 20 C.F.R. Part 404 Subpart P, Appendix 1. (Tr. 16.) At step four, the ALJ made the following finding as to Daniels' RFC determination:

> … the claimant has the residual functional capacity to perform a full range of
> work at all exertional levels but with the following nonexertional limitations: the

work must be limited to simple and repetitive tasks which require little or no independent judgment or analysis; the work place must be an environment that is no more than mild to moderately stressful; the work must be limited to intervals of no more than two hours before taking a break of 10-15 minutes to refresh the ability to persist at work-related tasks; the work must not require the ability to read or write; and the work must be shown by visual demonstration.

(Tr. 17.)  The ALJ found that Daniels was unable to perform any past relevant work.  (Tr. 22.) At step five, the ALJ found that there were a significant number of jobs in the national economy that Daniels could perform. Therefore, the Daniels was found not to be disabled.  (Tr. 22-24.)

## B.    DANIELS' ARGUMENTS ON APPEAL

Daniels has presented three claims of error to this Court on appeal.  First, Daniels argues that the ALJ's credibility determination was contrary to Social Security Ruling 96-7p ("SSR 96-7p") and thus patently erroneous.  Second, Daniels contends that there is not substantial evidence to support the ALJ's decision that Daniels' mental impairments did not meet or equal a listing level impairment.  Lastly, Daniels argues that there is not substantial evidence to support the ALJ's decision that there exist a significant number of jobs in the economy in which Daniels could perform.  Each claim of error is addressed below.

### 1.    The ALJ's Credibility Determination

Daniels argues that the ALJ erred in finding that Daniels' testimony was not credible. Factors to be considered by an ALJ in making a credibility determination include: (1) the objective medical evidence; (2) daily living activities; (3) the location, duration, frequency, and intensity of pain and other symptoms; (4) precipitating and aggravating factors; (5) medications taken; (6) treatment; (7) other measures taken to relieve symptoms; (8) any other factors concerning the claimant's functional limitations and restrictions. *See* SSR 96-7p. "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference ... [and] will reverse

an ALJ's credibility determination only if the claimant can show it was patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000) (citations and internal quotations omitted).

Daniels contends that the ALJ's determination on this matter was contrary to SSR 96-7p and thus constitutes reversible error. *See Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003) ("In evaluating the credibility of statements supporting a Social Security application ... an ALJ must comply with the requirements of Social Security Ruling 96-7p.").

First, Daniels argues the ALJ's credibility determination is erroneous because "[t]he ALJ relied on agency findings that determined [Daniels] was not credible because [Daniels'] allegations were not supported by the medical evidence." Pl's Br. at 26. In support of his argument, Daniels cites language from SSR 96-7p, which states that an "individual's statements ... may not be disregarded solely because they are not substantiated by objective medical evidence." *Id.* Unfortunately, it is apparent that Daniels' argument relies upon a misreading of SSR 96-7p. The mere reliance on the fact that a claimant's allegations are unsubstantiated by the medical evidence does not render an ALJ's determination erroneous; rather, an ALJ's determination is erroneous only if that fact is the *sole* rationale for the ALJ's credibility determination. *Id.* (A claimant's statements "may not be disregarded *solely* because they are not substantiated by objective medical evidence.") (emphasis added).

Defendant is quick to point out that the ALJ considered other evidence throughout his RFC discussion in addition to Daniels' allegations, which were inconsistent with the medical evidence. After careful review of the ALJ's decision, this Court is inclined to agree that the ALJ performed his due diligence in this matter.

The ALJ considered Daniels' daily living activities and noted his ability to perform simple cooking and other household chores. (Tr. 18.) The ALJ also pointed out discrepancies in

Daniels' allegations concerning daily living.  Specifically, Daniels testified that he had no friends; however, his wife stated that his cousins call him and he spends time on the phone with some friends in addition to family.  (Tr. 18.)  The ALJ noted Daniels' testimony that he was fired from Kroger but that that testimony was inconsistent with evidence that he reported quitting that job because he had too many responsibilities.  (Tr. 21.)  The ALJ considered Daniels' statement that he was "trying not to make more than $1,000 per month because of his [disability] claim."  (Tr. 21.)  The ALJ also recognized a medical examiner's statement that Daniels' "malingering is immediately evident" and that there was "unimpeachable evidence of [Daniels'] malingering of cognitive impairments."  (Tr. 19; 240-41.)

In addition to his first objection to the ALJ's credibility determination, Daniels also argues that the ALJ strayed from the requirements of SSR 96-7p by mentioning Daniels' failure to follow up with treatment without considering the reasons, such as poverty, for that failure. Daniels points out that an ALJ "must not draw any inferences about an individual's symptoms … from a failure to seek or pursue regular medical treatment without first considering any explanations …" given by the claimant.  SSR 96-7p.  However, the ALJ explicitly acknowledged that Daniels discontinued therapy "due to improvement and financial constraints."  (Tr. 20.) Moreover, this fact was not the basis for the ALJ's determination that Daniels' statements lack credibility.

A review of the ALJ's decision shows that the objective medical evidence, along with each of the factors outlined in SSR 96-7p, were considered by the ALJ when making a credibility determination. In order to reverse a credibility determination, it must be shown that the ALJ's determination was patently wrong. There is no doubt that Daniels has failed to meet that burden.

## 2. Listing Impairment under § 12.02

Daniels contends that the ALJ erred by determining that Daniels' impairments did not meet 20 C.F.R. Part 404 Appendix 1 Subpart P Listing of Impairments § 12.02 at step three. In this respect, Daniels makes four sub-arguments: (1) fairness and justice require reversal of the ALJ's decision; (2) the ALJ ignored or mischaracterized evidence contrary to his step three determination; (3) the ALJ erred in his treatment of Dr. Krebs' medical opinion; and (4) the ALJ's failure to summon a medical advisor to testify was error. Each argument is addressed separately below.

### a. Fairness and Justice

Daniels contends that fairness and justice require reversal of the ALJ's denial decision. Daniels alleges that the ALJ has acted prejudicially and that such unfair and unjust treatment on the part of the ALJ warrants reversal of the decision. Daniels refers the Court to *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988), which states that a "decision should contain and should be based upon a fair and impartial presentation of the medical evidence submitted by the claimant or obtained from other sources."

The Court is confounded by this argument. While the Court acknowledges the validity of Daniels' premise that the ALJ may not treat a disability claimant with such prejudice, Daniels has neglected to explain how the ALJ in this case acted in such a manner. Daniels alludes to a "refusal of the agency and its ALJ even to acknowledge a claimant's evidence and the arbitrary rubber-stamped approval of the agency's denial decision." Pl's Br. at 13. However, Daniels has failed to support this accusation by tying his allegation of unfair treatment by the ALJ to any specific facts of this case. Conjectural abstract arguments concerning the behavior of a

theoretical ALJ are not adequate grounds for reversal.  The Court finds that Daniels' contention on this point to be without merit.

          b.      <u>The ALJ's Failure to Acknowledge Evidence Contrary to the Decision</u>

Daniels argues that the ALJ erred in his step three determination because it lacked the requisite substantial evidence.  Daniels supports his contention by asserting that the ALJ ignored and mischaracterized evidence that proved Daniels met Listing 12.02.

It is not permissible that "the ALJ select and discuss only that evidence that favors his ultimate conclusion," *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994) (citation omitted), nor may an ALJ mischaracterize evidence favorable to the claimant.  *Golembiewski v. Barnhart*, 382 F.3d 721, 725 (7th Cir. 2004).  That said, it is not required that the ALJ evaluate each piece of evidence or testimony submitted and discuss that evidence fully and separately.  *Herron*, 19 F.3d at 333.  "However, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984).

Daniels points to several instances in the decision where he believes that the ALJ has acted erroneously. First, Daniels contends that the ALJ, despite citing to the evaluation, ignored findings by Daggy in the evaluation conducted in July 1996.  However, the Court finds that this is not the case. Specifically, Daggy's findings included that Daniels was functionally illiterate, performed significantly lower than his expected abilities, and was "Mildly Mentally Handicapped."  (Tr. 264-66.)  In his decision, the ALJ discussed the psychological evaluation conducted by Dr. Martin in December 2007. The ALJ noted Daniels' IQ scores from that evaluation and stated that those scores were "well above the claimant's performance during the consultative examination." (Tr. 19.)  The ALJ further noted that the 2007 evaluation was

consistent with borderline intellectual functioning and stated that "it is noteworthy [that] these scores are consistent with prior testing in 1996." (Tr. 19.) Thus, not only did the ALJ acknowledge the 1996 evaluation, but he specifically discussed evidence that supported the very findings Daniels accuses the ALJ of ignoring.

Second, Daniels asserts that the ALJ ignored evidence from a hospital clinic dated April 2007, which included that Daniels' depression started with a change in job duties, his diagnosis was major depressive disorder, and that job stress was severely affecting his mood. (Tr. 212.) In addition to citing the evaluation in question, the ALJ discussed the fact that Daniels' depression was connected to his employment (Tr. 20), that he suffered from depression (Tr. 15; 20), and that he displayed symptoms of tension and anxiety (Tr. 19).

Next, Daniels contends that the ALJ erroneously ignored or rejected a GAF score of 40 given to Daniels by Dr. Blake, along with evidence indicating the affect Daniels' illiteracy had on his daily living. With regard to the evidence relating to Daniels' daily living, the ALJ noted that "[h]is wife stated the claimant is unable to cook or do laundry because he cannot read labels." (Tr. 16.) The ALJ then discussed evidence supporting his finding of only a mild restriction in this area, including that Daniels reported performing simple cooking and doing chores. (Tr. 16.) The ALJ also discussed the low GAF score assessed by Dr. Blake and provided a well-reasoned analysis of other (higher) assigned GAF scores to explain that the GAF of 40 was not inconsistent with his determination that Daniels was not disabled. (Tr. 21.)

Fourth, Daniels makes note of several statements made by a job coach from Midtown Community Mental Health Center & Vocational Rehabilitation services and argues that the ALJ erroneously ignored evidence regarding Daniels' use of a job coach. Unfortunately, Daniels has not demonstrated to the Court that this evidence is in any way supportive of a finding that

Daniels is medically disabled under a step three analysis, let alone that it constitutes substantial evidence contrary to the ALJ's decision. Without explanation as to how this unapparent inference is to be made, the Court is unwilling to take this logical leap and direct undue attention to this evidence.[1]

Next, Daniels alleges that the ALJ ignored or rejected findings made by Dr. Martin during a psychological evaluation on December 20, 2007. However, this evaluation was cited numerous times throughout the ALJ's decision. (Tr. 16; 17; 19; 20.) Daniels focuses specifically on Dr. Martin's notes indicating Daniels' functional illiteracy and potential learning disorder. Daniels also takes issue with the ALJ's alleged failure to recognize reports made by Daniels at the evaluation concerning his symptoms. First, the ALJ took Daniels' illiteracy and intellectual impairments, including his learning disability, into account throughout the ALJ's analysis. (Tr. 15-21.) With regard to Daniels' report of his symptoms to Dr. Martin, the ALJ made a valid determination that statements made by Daniels regarding his symptoms were not credible. Thus, any reluctance on the part of the ALJ to articulate specific statements made by Daniels regarding the severity of his symptoms is inconsequential. This Court finds no occasion to require that the ALJ elaborate on a claimant's statements when such statements have been found to lack credibility.

It bears repeating that the ALJ need not evaluate in writing every piece of evidence or testimony and discuss that evidence fully and separately. "If the ALJ were to ignore an entire line of evidence, that would fall below the minimal level of articulation required." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (citing *Zblewski*, 732 F.2d at 78-79). However, an ALJ is not required to address evidence in such a way that would be essentially redundant.

---

[1] It is worth noting that, although Claimant has not shown how the existence of a job coach supports his argument that he is disabled under step three, the ALJ nonetheless acknowledged the fact that Claimant was receiving those services. (Tr. 21.)

*Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). Here, Daniels is effectively asking that the ALJ construct his decision in a redundant fashion. The Court finds that there is substantial evidence to support the ALJ's step three decision, and the ALJ did not ignore or mischaracterize evidence contrary to the decision.

c.    <u>Treatment of Dr. Krebs' Medical Opinion</u>

Finally, Daniels takes issue with the ALJ's treatment of the medical opinion given by Daniels' treating primary care physician, Dr. Krebs, and the weight given to that source. In particular, Daniels refers to a statement by Dr. Krebs that Daniels was "able to work up to 4 hours/day without restrictions on physical activity." (Tr. 317.) The ALJ determined that "to the extent [Dr. Krebs'] opinions are based on the claimant's mental impairments they are also given little weight." (Tr. 22.)

Generally, the opinion of a treating physician is entitled to controlling weight by the ALJ because such opinions often provide a "detailed, longitudinal picture" of a person's medical impairments. 20 C.F.R. § 404.1527(d)(2). However, a treating physician's opinion is deserving of such weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Id. See also Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004). When a treating source's opinion is not given controlling weight, the ALJ must give reason for that decision and consider factors including, *inter alia*: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability; (4) specialization. *See* 20 C.F.R. § 404.1527(d)(2)-(6).

The ALJ properly considered the aforementioned factors in determining that less weight should be given to Dr. Krebs' opinion. First, the ALJ pointed out that Dr. Krebs' opinion was not

supported by the objective medical evidence, clinical findings, or treatment history concerning Daniels' impairments. (Tr. 22.) The ALJ also noted that the evidence did not indicate "a treating relationship of a nature, duration, and frequency that generally entitles a treating source opinion to greater weight." (Tr. 22.) Furthermore, the ALJ noted: "Dr. Krebs is a primary care physician, she is not an expert in mental health. It also is not clear that Dr. Krebs was able to review the relevant mental health evidence from other treating and examining sources." (Tr. 22.) The ALJ concluded that more weight should be given to the opinions of the State's psychological experts, Dr. Modlik and Dr. Martin. (Tr. 22.)

Daniels has made no attempt to rebut the specific bases upon which the ALJ determined that less weight should to be given to Dr. Krebs' opinion; rather, his is a general challenge to the ALJ's decision on this matter. Ultimately, in concluding that more weight should be given to the opinions of the State's psychological experts, the ALJ properly considered the relevant factors required by the Code of Federal Regulations. Because the Court finds that there is substantial evidence for making this determination, the ALJ did not err by affording less weight to the opinion of Dr. Krebs.

        d.       The ALJ's Failure to Summon a Medical Expert to Testify

Daniels argues that the ALJ's failure to summon a medical expert to further testify as to whether Daniels' combined impairments equaled Listing 12.02 is reversible error. Daniels states that the ALJ simply assumed the absence of an equivalency without relevant discussion. In support of his argument, Daniels cites *Barnett v. Barnhart,* a case involving reversal of an administrative law judge's decision due to a perfunctory, step three analysis, which consisted of only two-sentences. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004).

The court in *Barnett* found that it was apparent from his perfunctory analysis that "the ALJ never consulted a medical expert regarding whether the listing was equaled … and an ALJ must consider an expert's opinion on the issue." *Id.* (citing 20 C.F.R. § 404.1526(b)) ("Medical equivalence must be based on medical findings…. We will also consider the medical opinion given by one or more medical or psychological consultants designed by the Commissioner in deciding medical equivalence."). The court went on to say that a SSA-831-U5, SSA-832-U5, or SSA 833-U5 (i.e. a Disability Determination Transmittal Form) could not be located in the record which "would otherwise satisfy the ALJ's duty to consider an expert's opinion on medical equivalence." *Barnett,* 381 F.3d at 671. Daniels argues that the ALJ's failure to call a medical expert to testify in the present case constitutes reversible error based upon the principles of *Barnett*.

While the Court takes notice of Daniels' contention on this point, the Court, ultimately, is not persuaded. The ALJ's decision in this case is distinguishable from *Barnett* in several respects. In addition to the administrative law judge's failure to solicit an expert witness in *Barnett*, the judge also disregarded medical records and testimony and provided a grossly inadequate explanation for his conclusion that a listing was not equaled. In contrast, the ALJ in this case has performed an adequate analysis in which he has properly consulted medical evidence from the record in support of his findings. (Tr. 16-17.) Furthermore, the ALJ did not erroneously discredit entire testimonies, as was done in *Barnett*. The ALJ's analysis of the severity of Daniels' impairments cannot be likened to the two-sentence analysis found in *Barnett*. The two are simply not comparable.

Moreover, the Court finds additional guidance on this issue in the Seventh Circuit's decision in *Similia v. Astrue*, 573 F.3d 503 (7th Cir. 2009). In *Similia*, the court explained that

"[a]n ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is *not readily discernable*." *Id.* at 516 (quoting *Barnett*, 381 F.3d at 669; emphasis added). An administrative law judge is entitled to evaluate the evidence within the record and need not call on a medical expert when such evidence is readily discernable. *Similia,* 573 F.3d at 516.

In the present case, the medical evidence was readily discernable. Two Disability Determination and Transmittal Forms were completed and indicate that Daniels was not disabled based on medical evaluations. (Tr. 55; 56); *Cf. Barnett,* 381 F.3d at 671 (noting that no Disability Determination and Transmittal Form existed in the record upon which the ALJ could have relied in fulfilling his duty to consider an expert medical opinion). The ALJ, in his decision, acknowledged the evaluations upon which these forms were based. (Tr. 15.) *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (A claimant's argument that the ALJ erred at step three was "contradicted by the reports of two state agency physicians … [who] filled out Disability Determination and Transmittal forms and stated that [the claimant] was not disabled …"). In his step three determination, the ALJ elicited medical evidence and testimony in the record that supported the conclusion that Daniels was not disabled under step three. (Tr. 16-17.) Medical evidence cited by the ALJ includes the mental status examination performed by Dr. Blake and a psychological evaluation performed by Dr. Modlik. (Tr. 16-17; 227-29; 238-42.) The evidence presented by the ALJ, which was used to conclude that Daniels did not have a marked restriction, corroborated and substantiated the findings by state physicians that Daniels was not disabled.

The proposition that Daniels is not disabled is readily discernable from the available medical evidence. Moreover, the ALJ adequately explained the reasons for his determination

that Daniels' impairments did not meet the 12.02 listing. Therefore, the ALJ did not err by declining to call an expert to testify as to whether Daniels' impairments equaled a listing.

### 3. The ALJ's Determination that Daniels could Perform Jobs in the Economy

Daniels' final argument states that the ALJ erred during in his step five determination. Specifically, Daniels contends that the ALJ's step five determination was erroneous because it relied on a residual functional capacity that was based upon a failure by the ALJ to properly consider substantial evidence favoring Daniels' petition for disability. *See Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001) (case was remanded for a redetermination of the claimant's residual functional capacity where the ALJ erroneously ignored evidence that affected the claimant's ability to work).

It is apparent that Daniels' final argument is wholly reliant upon whether the ALJ failed to discuss evidence contrary to his decision or erroneously weighed opinion evidence obtained from Dr. Krebs. As discussed above, the ALJ did not err in those respects, and there was substantial evidence to support those determinations. Therefore, Daniels' final argument attacking the ALJ's step five determination fails necessarily.

## IV. CONCLUSION

For the foregoing reasons, the final decision of the Commissioner of Social Security is hereby **AFFIRMED.**


SO ORDERED.

DATE: ___08/05/2011_____

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana


Distribution attached.

DISTRIBUTION:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
Patrick@mulvanylaw.com